UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FELIPE VICINI LLUBERES and    )
JUAN VICINI LLUBERES,         )
                              )
     Plaintiffs,              )
                              )          CIVIL ACTION
v.                            )          NO. 07-11623-DPW
                              )
UNCOMMON PRODUCTIONS, LLC,    )
and WILLIAM HANEY III,        )
                              )
     Defendants.              )


MEMORANDUM AND ORDER
August 16, 2010


In 2007, a documentary titled *The Price of Sugar* was
released and distributed by the Defendants, Uncommon Productions,
LLC and William Haney III, chronicling the working conditions of
Haitian laborers on sugarcane plantations in the Dominican
Republic.  The film refers by name to the Plaintiffs, Felipe and
Juan Vicini Lluberes (collectively, the "Vicinis"), who are
executives in a family business that owns and operates Dominican
sugarcane plantations.  In this diversity suit, the Vicinis
allege that the film makes a series of defamatory statements
about them and their sugar production operations.  The
Defendants' Motion for Summary Judgment before me contends that
the Vicinis, as limited purpose public figures, cannot
demonstrate actual malice on the part of the Defendants.

-1-

## I.   BACKGROUND

### A.   *Factual Background*

#### 1.   Content of the Film

*The Price of Sugar* includes footage of several large Dominican sugarcane plantations, as well as the villages where the workers reside, called *bateyes*.  Much of the film follows the actions of Father Christopher Hartley, a Catholic priest working in the Dominican Republic who sought to improve working conditions in the *bateyes* and sugarcane plantations in his parish.  The film depicts conditions of the workers as including little access to decent housing, adequate food, education, or sanitary water sources.  Father Hartley and the film's narration specifically reference the Vicini plantations and the Vicini family at several points in the film.

#### 2.   Production and Release of the Film

The three individuals primarily responsible for the content of *The Price of Sugar* are Haney, Eric Grunebaum, and Peter Rhodes.  Filming began in March 2004, and over the next two years, the filmmakers made eight trips to the Dominican Republic to shoot footage for the film.  The Defendants began editing the film in 2005, with Rhodes doing most of the day-to-day editing of the film sequences.  Grunebaum provided general feedback during the creative and editing process, while Haney had final authority on editorial decisions.

Because the film was developed over a period of time, and in the midst of changing circumstances, it did not have an established storyline, but rather followed Father Hartley in his work with the Haitian plantation workers.  As the Defendants developed film sequences, they created footnoted scripts with sources for the facts presented in the film.  The film was released on March 11, 2007.

### 3.  Allegedly Defamatory Statements

The Plaintiffs allege that the film made seven defamatory statements about the Vicinis.

Statement 1:  At approximately 23:28 in the film, Father Hartley makes this statement:

> FATHER HARTLEY: The Vicini family have a lot of blood
> on their hands.  This is well known.  Nobody dares
> speak out and say it because many people fear for their
> lives or the lives of their loved ones.  And this is a
> fact.  People disappear.  People are never found.

The Plaintiffs contend that this implies that the Vicinis kidnap people and/or murder them.

Statement 2:  At 1:13:59 in the film, Jhonny Belizaire makes the following statement, as translated in the subtitles:

> JHONNY BELIZAIRE: If they get Father Christopher out of
> the country I am not going to wait for the Vicini to
> send someone to kill me.  I would kill myself.  Anyone
> following Father Christopher's path is in great danger.

The implication, according to the Vicinis, is that the Vicinis will kill Belizaire after Father Hartley leaves the Dominican Republic.

Statement 3:  The Narrator states the following at
approximately 1:25:45:

> NARRATOR: The batey is still a dangerous place.  Jhonny
> has been fired.  He and his family have been threatened
> with eviction from their home; but without legal
> status, they are unable to go elsewhere to make a
> living.  And the attacks on Father Christopher
> continue.

The Vicinis suggest that the implication of the statement is that
the Vicinis threatened Belizaire and his family and are
imprisoning him because of his illegal status in the Dominican
Republic.

Statement 4:  The fourth statement is a recorded statement
presented in conjunction with a series of images, appearing at
approximately 2:33:

> FATHER HARTLEY: One of the first things I was told -
> some of the people in the Dominican Republic came to me
> saying, by the way, remember you're not allowed into
> the Vicini bateyes.  It took me three months to muster
> the courage to go into the sugarcane fields.

> NARRATOR: The growing and harvesting of Dominican sugar
> is done almost entirely by laborers from Haiti.  What
> Father Christopher saw in the plantations he began to
> document.

The statement is followed by a series of still images, four of
which are highlighted by the Plaintiffs: (1) a boy sitting on a
pile of sugarcane, holding a machete; (2) a boy cutting
sugarcane, wearing no shirt; (3) a young child chewing on a piece
of sugarcane, holding a syringe near his mouth; and (4) a pair of
hands with a finger missing.  The Plaintiffs allege that the film
implies that these images were taken of workers and conditions on

-4-

Vicini *bateyes*.

Statement 5:  At 4:26 in the film, the following recorded statement is made by Father Hartley:

> FATHER HARTLEY: Gradually, I began to learn more about their [people living on Vicini bateyes] situation. What I discovered was truly appalling.

This statement is followed by images from a barrack, such as a one-legged man and a woman with a scarred face.  The Plaintiffs maintain that the statement, in conjunction with images on the screen, implies that the images depict conditions on Vicini-owned plantations, when in fact they were filmed at *batey* Paloma, not owned by the Vicinis.

Statement 6:  The following statement appears at approximately 17:43:

> FATHER HARTLEY: This is where they're going to put the workers when they arrive.  Anywhere from 60 to 100 people are going to be crammed into this one barrack. You can see all this barbed wiring up on the top which is to prevent them from escaping at night and they will have armed men at the doors of the barracks in the night so they don't attempt to flee the barrack in the night.

The statement appears in conjunction with images on the screen, which the Plaintiffs allege implies that the Vicinis treat their laborers like prisoners, confine them to the plantations against their will, and will shoot or injure workers attempting to leave the plantations.

Statement 7: At 20:22 in the film, the Narrator makes the following statement:

> NARRATOR: The batey dwellers get much of their calories from chewing sugarcane.  Their diet often leads to malnutrition.

The image on the screen is of an emaciated child sitting in a dirty car seat on the ground.  The Plaintiffs argue that the combination of the statement and the image implies that the latter depicts conditions on the Vicini plantations.

## B.  *Procedural History*

In August 2007, the Plaintiffs filed a Complaint in this Court, alleging fifty-three defamatory and false statements in *The Price of Sugar*.  Early in the litigation, the Plaintiffs, having narrowed the scope of their claims to seven specific defamatory statements, brought a Motion for Partial Summary Judgment.  I denied that motion as a premature effort to resolve the merits of what is inevitably a highly fact-bound inquiry. After the completion of discovery, the Defendants brought this second Motion for Summary Judgment now before me as to the seven statements.

## II.  STANDARD OF REVIEW

A court awards summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  "At summary judgment, the court's task is

not to weigh the evidence and determine the truth of the matter
but to determine whether there is a genuine issue for trial."
*Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009)
(internal quotation marks and citation omitted).  Accordingly, I
must view the record in the light most favorable to the
Plaintiffs, drawing reasonable inferences in their favor.  *Id.*

### III.   ANALYSIS

The Defendants' motion for summary judgment makes two
arguments related to First Amendment limitations on defamation
law: first, that the Plaintiffs are limited purpose public
figures, thereby requiring a showing that the Defendants'
statements were made with actual malice; and second, that no
reasonable jury could conclude that the Defendants made the
statements with actual malice.[1]

### A.   Public Figure Status

Given the limited scope of the Defendants' motion for
summary judgment, the motion must be denied unless the Defendants

---

[1] The Defendants do not expressly address the five common
law elements of a defamation claim under Massachusetts law: "(1)
that the defendant published a written statement; (2) of and
concerning the plaintiff; that was both (3) defamatory, and (4)
false; and (5) either caused economic loss, or is actionable
without proof of economic loss."  *Noonan v. Staples, Inc.*, 556
F.3d 20, 25 (1st Cir. 2009); *see also Phelan v. May Dep't Stores
Co.*, 819 N.E.2d 550, 553 (Mass. 2004).
    In the course of disputing the evidence on actual malice,
however, the Defendants do implicitly contest whether some of the
alleged statements would satisfy certain common law elements.  I
take up these arguments in my discussion of actual malice, Part
III.B, *infra*.

establish that, as a matter of law, the Vicinis are public
figures.

### 1.  Legal Treatment of Public Figures

If a defamation plaintiff is a private individual, he must
merely show that the defendant made the statement with
negligence.  *Stone v. Essex County Newspapers, Inc.*, 330 N.E.2d
161, 168 n.6 (Mass. 1975).  Plaintiffs who are public figures,
however, must show that the statement was made with "actual
malice," i.e., knowledge of the statement's falsity, or reckless
disregard as to whether the statement was true or false.  *N.Y.
Times v. Sullivan*, 376 U.S. 254, 280 (1964).

Defamation law recognizes two categories of public figures:
general purpose public figures, who have "general fame or
notoriety in the community, and pervasive involvement in the
affairs of society"; and limited purpose public figures, who
"thrust themselves to the forefront of particular public
controversies in order to influence the resolution of the issues
involved."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 352
(1974); *see also Pendleton v. City of Haverhill*, 156 F.3d 57, 67
(1st Cir. 1998).  Defendants here contend the Plaintiffs are
limited purpose public figures.

## 2.  Determining Public Figure Status[2]

Inquiry into public figure status presents an objective test, in which a court considers how a "reasonable person" would view the plaintiff, looking at the totality of the circumstances and considering the facts as a whole.  *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1293-94 (D.C. Cir. 1980).  Determining public figure status is a legal question for the court, *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 207 (1st Cir. 2006), but the status is also "heavily dependent on the underlying factual record."  *Id.* at 204.  The burden is on the defendant, as the moving party, to prove that the plaintiff acted as a limited purpose public figure.  *Id.* at 205.

For the Defendants to show that the Vicinis are limited purpose public figures, they must address three primary topics: (1) identification of a "public controversy"; (2) whether the plaintiff "thrust [himself] to the forefront of the controvers[y] so as to become factors in [its] ultimate resolution"; and (3) whether the alleged defamation was "germane to the plaintiff's

---

[2] Some of the evidence referenced here and elsewhere is drawn from the Koch Declaration.  (Doc. No. 162.)  The Plaintiffs have moved to strike significant portions of the Koch Declaration for failure to meet the requirements of Federal Rule of Civil Procedure 56(e).  (Doc. No. 166.)  To the extent that either the Defendants or the Plaintiffs have made arguments not supported by the record, or have relied on evidence adduced in a manner not compliant with the Federal Rules of Civil Procedure, I have, of course, disregarded them.  Because I need not evaluate the challenged paragraphs independently from my treatment of the motion for summary judgment, however, I will deny the Plaintiffs' motion.

participation in the controversy." *Waldbaum*, 627 F.2d at 1296-98; *see also Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1494 (11th Cir. 1988) ("The proper standards for determining whether plaintiffs are limited public figures are best set forth in *Waldbaum* . . . ."); *Nicholson v. Promotors on Listings*, 159 F.R.D. 343, 344 (D. Mass. 1994)(applying the *Waldbaum* test).

### a.  What was the Public Controversy?

A public controversy is not simply a matter of public interest, but rather "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum*, 627 F.2d at 1296.  The fact that a private dispute attracts widespread attention is not sufficient; the public attention that it attracts must result from the controversy's effects on those who are not direct participants. *Id.*; *see Time, Inc. v. Firestone*, 424 U.S. 448, 454-55 (1976) (finding that the high-profile divorce of a very wealthy couple was not a public controversy).

The controversy that gave rise to *The Price of Sugar* concerns the treatment of Haitian laborers by Dominican sugar producers.  Such practices have received scrutiny within the Dominican Republic, as well as by the United States and international organizations for many years.

The International Labour Organization, an agency of the United Nations, sent a delegation to the Dominican Republic in 1972 to investigate conditions on sugar plantation *bateyes*.  In

the late 1970s, the United States-based National Council of
Churches began to campaign for higher wages for Haitian cane
cutters working for Gulf + Western, Inc. in the Dominican
Republic.

In 1986, the human rights organization Americas Watch (a
predecessor of Human Rights Watch) issued a series of reports
alleging that sugarcane plantations in the Dominican Republic
were engaging in human trafficking and child labor.  This
initiative prompted a years-long investigation by the Office of
the United States Trade Representative, Congress, and the
Departments of Labor, Commerce, and Agriculture.  The
investigation concluded in 1991 that no immediate action was
required because sugar producers had committed to improving their
labor practices, but United States officials planned to continue
to monitor the situation.  The sugar industry is of particular
interest to United States trade officials, because the Dominican
sugar industry is subsidized by an import quota system providing
that Dominican sugar prices in the United States are higher than
in other markets.

In a 1996 report titled "Beyond the Bateyes: Haitian
Immigrants in the Dominican Republic," the National Coalition for
Haitian Rights described the history of its activities on the
issue, which involved working with Americas Watch between 1989
and 1992 to improve labor and living conditions in *bateyes*.
Conditions on the *bateyes* were also revealed in two books

published on the subject in the 1980s:  *Bitter Sugar* (1981) and *Sugar and Modern Slavery* (1987).

The controversy over labor conditions on the *bateyes* was further inflamed when Father Hartley became directly involved in the issue after arriving to the Dominican Republic in 1997.  At a gathering in 2000 that included Dominican President Leonel Fernández, Father Hartley made a controversial speech describing the 70 nearby *bateyes*:

> Mr. President[,] I don't know if you are aware of it or not, but you are [at] the threshold of Hell.  Look around you and you will see these endless fields of cane.  Cane that has grown fertilized with the blood and the sweat and the tears of poor Dominican and Haitian men. . . . Spread across [these] cane fields, hidden conveniently behind a barricade of sugar cane, there are more than 70 bateyes.  Approximately half of them belong to . . . the all-powerful and omnipresent Vicini family. . . . Mr. President[,] God, whose blessing we ask for today, knows that these bateyes are more fit to be inhabited by animals than by men.

The media thereafter began to cover Father Hartley's involvement in improving the *bateyes* conditions.  *El Mundo*, one of Spain's largest newspapers, published an article in January 2003 about the poor living conditions on Dominican sugar plantations.  The workers, according to the article, "live every harvest season in miserable barracks and in tin houses without electricity, without potable water, and for the most part, without latrines. . . ."  The article described a Vicini plantation guard named "Merité," who reportedly beat Haitians with a machete when they were caught trying to escape their

barracks.

In 2004, the United States Department of State issued its annual "Country Reports on Human Rights Practices," identifying the problems found in the Dominican *batey* system.   The report mentioned both the "sugar cane consortium owners" generally as well as the Vicini family in particular.   In January 2005, Miami's *El Nuevo Herald* published a lengthy article on labor conditions on the Vicini plantations, triggering debates on radio and television stations in the United States.

This news coverage demonstrates that the working conditions on Dominican sugarcane plantations, including the conditions on Vicini property, were a public controversy well before the Defendants' release of *The Price of Sugar* in 2007.

According to the Vicinis, the Defendants have characterized the controversy too broadly, and the controversy here is Father Hartley's allegations regarding the conditions for migrant Haitian workers on Vicini-owned *bateyes*.   The Vicinis' characterization has two flaws.   First, they misconstrue Father Hartley's involvement, which was not limited to criticizing conditions only at Vicini *bateyes*.   In his speech to the President in 2000, highlighting the problems found on seventy nearby *bateyes*, Father Hartley stated that only "[a]pproximately half" of the *bateyes* were on Vicini land.   Although Father Hartley seems to focus his publicity and advocacy efforts on the Vicinis, the record does not show that he was concerned

exclusively with conditions found on Vicini property.

Second, the Vicinis suggest implausibly that Father Hartley's remarks, rather than the labor conditions that he described, are the public controversy in question.  The fact that an individual has made an allegation, and thereby attracts media attention, is not itself a public controversy.  "Newsworthiness alone will not suffice" to turn a private issue into a public controversy.  *Waldbaum*, 627 F.2d at 1296; *see also Time, Inc.*, 424 U.S. at 454 (noting that a public controversy cannot be equated with a "cause celebre").  A public controversy is one for which "persons beyond the immediate participants in the dispute . . . feel the impact of its resolution."  *Waldbaum*, 627 F.2d at 1297.  Here, the substantive concerns raised in Father Hartley's remarks, not the act of their publication, touch nonparticipants.  These substantive concerns cannot be distinguished meaningfully from the public controversy as identified by the Defendants.

Although the public controversy at issue is broader than one specific to the Vicinis, courts have acknowledged that broad topics can be public controversies even when they were the subject of particular concern.  For example, in *Gray v. St. Martin's Press Inc.*, No. 95-285-M, 1999 WL 813909, at *1 (D.N.H. 1999), defamation was found in a book titled *The Power House, Robert Keith Gray and the Selling of Access and Influence in Washington*, which described the activities of Gray and other high-powered lobbyists.  While the book discussed Gray's actions

-14-

in particular, the court found the public controversy to be more general - the influence of political lobbyists on elected officials - despite the "plaintiff's efforts to narrowly circumscribe the scope of the 'public controversy'. . . ." *Id.* at *3.

The Vicinis also make a geographical argument: that because the controversy exists in the Dominican Republic - not in the United States, where the film was released - the Vicinis cannot be public figures for purposes of the defamation.  The Supreme Judicial Court of Massachusetts has suggested that the plaintiff must be a public figure with respect to the audience of the statement.  *See Materia v. Huff*, 475 N.E.2d 1212, 1215 (Mass. 1985) (observing that the plaintiff's public figure status is determined in relation to the union members who received the allegedly defamatory letter, rather than in relation to the "community at large").  The Plaintiffs, however, are public figures with respect to the United States because the public controversy existed both in the Dominican Republic and in the United States.  The labor conditions were followed by American media outlets, such as Miami's *El Nuevo Herald* and the television network Univision; the State Department had taken notice of the problem; American diplomats had visited the *bateyes*; and the United States Ambassador to the Dominican Republic stated that his staff had an interest in the conditions at the sugar plantations.

Such interest of United States actors and organizations in the issue is similar to *Trotter v. Jack Anderson Enterprises, Inc.*, 818 F.2d 431 (5th Cir. 1987), where the plaintiff was the president of a Guatemalan soft-drink bottling company whose anti-union violence drew international attention and criticism.  The defendant had published an article in the United States criticizing Trotter's involvement in the violence.  *Id.* at 432. The court found that the issue was a public controversy in the United States because social and political turmoil in other Western Hemisphere countries aroused "particular domestic concern."  *Id.* at 434.  Similarly, the Dominican Republic is a Western Hemisphere country whose sugar products are exported to the United States under a heavy subsidy, and whose labor and human rights records have raised domestic concern.

From the commentary and activities of the media, government institutions, and actors directly involved, I find that the public controversy that preceded the Defendants' film was the treatment of Haitian workers on Dominican sugarcane plantations. This controversy was a matter of concern in the United States, including an audience in Massachusetts not directly affected by the dispute.

### b.  What Was the Vicinis' Role in the Controversy?

The second step to determine public figure status is to identify the Plaintiffs' role in the public controversy. *Waldbaum*, 627 F.2d at 1297.  The Supreme Court has made clear

that the Plaintiffs must have "thrust themselves to the
forefront" of the issue, *Gertz*, 418 U.S. at 345, and must have
achieved a "special prominence" in the debate.  *Id*. at 351.  This
standard also applies to those who have pursued certain types of
careers: if the plaintiff has "*chosen* to engage in a profession
which draws him regularly into regional and national view . . .
even if he has no ideological thesis to promulgate, he invites
general public discussion" and may therefore be "presumed to have
accepted public figure status."  *Marcone v. Penthouse Int'l
Magazine for Men*, 754 F.2d 1072, 1083-84 (3d Cir. 1985) (internal
quotations omitted).

The Plaintiffs cannot reasonably dispute that they are
involved in the controversy over the labor conditions on
Dominican sugarcane plantations.  Felipe and Juan Vicini assumed
important roles in the family business in 1997 and 2000,
respectively.  The operation that they manage involves a large
portion of Dominican sugarcane production and has garnered
international attention for its working conditions since the
1970s.  Indeed, when Juan Vicini joined the business in 2000, his
responsibilities included managing the "social and humanitarian
issues inside communities in the sugar mills."  The United States
Department of State's 2004 report on human rights, which
discussed the *batey* conditions in the Dominican Republic,

identified the Vicini family by name.[3]

Due to Father Hartley's activism on the issue, the Vicinis became more directly involved in addressing concerns about *batey* conditions.  The Plaintiffs met with Father Hartley in March 2000, and subsequently hired a social worker to identify general areas that should be dealt with first.  Juan Vicini toured the *bateyes* with Father Hartley and testified that he was "shocked" by the conditions there.  The Vicinis accepted, and sometimes engaged, international involvement and attention.  In 2004, Felipe Vicini accepted the United States Embassy's offer of an assignment of Peace Corps volunteers to the *bateyes*.  Also in 2004, Juan Vicini met with United States diplomats on a tour of Vicini *bateyes* "so that they could verify themselves what they were perceiving vis-à-vis the media. . . . "  The Vicinis prepared a fact sheet on their sugar operations, which they distributed to members of the United States Congress.

The Vicinis' response to this aspect of the limited purpose public figure analysis is twofold: first, that they were not publicly involved in the controversy before 2003; and second,

---

[3] The Vicinis are very involved in the regulation and coordination of the industry more generally, although that activity is less significant to the *Gertz* inquiry into whether the Vicinis thrust themselves into the issue of labor conditions. From 2002 to 2005, Juan Vicini was a member of the board of directors for Junta Agroempresarial Dominicana, the Dominican Agribusiness Board, which is a lobbying entity for the country's agricultural businesses.  Felipe Vicini has served since 2000 on the board of INAZUCAR, which is the sugar regulatory authority in the Dominican Republic.

that between 2003 and 2007, their activities were simply defenses
to the defamatory statements made by Father Hartley in other
contexts.  Both arguments are flawed.

On the first point, the Plaintiffs contend that between 2000
and January 2003, they were privately involved in discussions
with Father Hartley, and had not thrust themselves into the
controversy.  The Vicinis argue that they did not become
voluntarily involved in the controversy until the publication of
the *El Mundo* article in January 2003, which allegedly republished
defamatory statements made by Father Hartley.

The record, however, indicates that the Vicinis took on a
voluntary and prominent role in the controversy prior to the *El
Mundo* article.  They published an advertisement in a Dominican
newspaper following Father Hartley's speech in 2000.  Their
meetings and discussions with Father Hartley were directed at
identifying the problems at the *bateyes* and their potential
solutions.  The Plaintiffs argue that they did not "publicize
their activities" with Father Hartley, but publication of one's
involvement is not necessary for a court to find that a plaintiff
thrust himself into the resolution of an issue.  As noted in
*Trotter*, "[w]hile an individual can achieve public-figure status
by aggressively seeking public attention or by exercising his
access to the media, an individual cannot erase his public-figure
status by limiting public comment and maintaining a low public
profile."  818 F.2d at 435-36.  In *Nicholson*, the court found the

-19-

plaintiff to be a public figure even though he was not well known; the alleged defamation, which occurred in the context of investigative reporting, purporting "to uncover matters of public concern previously hidden from the public view." 159 F.R.D. at 345 (quoting *Trotter*, 818 F.2d at 434).

On the second point, the Vicinis maintain that their activities between 2003 and 2007, when *The Price of Sugar* was released, merely constituted responses to the defamatory remarks made by Father Hartley. They rely on *Hutchinson v. Proxmire*, 443 U.S. 111 (1979), which held that a plaintiff's public response to a defamatory statement does not turn the plaintiff into a limited purpose public figure. *Id.* at 135 ("Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."); *see also Bruno & Stillman, Inc. v. Globe Newspaper, Co.*, 633 F.2d 583, 591 (1st Cir. 1980) (requiring that a court find a public controversy "antedating" the publication of the defamatory statement). To claim that a plaintiff is a public figure by attracting considerable attention after the publication of the subject defamation "is bootstrapping of the most flagrant sort." *Kassel v. Gannett Co.,* 875 F.2d 935, 941 (1st Cir. 1989).

But the Vicinis have not shown that Father Hartley made any defamatory statements requiring the Vicinis' response and defense. They describe Father Hartley's statements in the *El*

*Mundo* article as a "smear campaign" and as "falsely accusing [the Vicinis] of humanitarian crimes."  Beyond these assertions, the Plaintiffs do not provide any further information about how Father Hartley's statements in the 2003 article were defamatory or false.

In fact, the article only mentions the Vicini name a handful of times: once to state that the Vicini family calls Christopher Hartley "Father"; three times to refer to the Vicini corporate entities, Casa Vicini and Consorcio Vicini; and once to refer to Juan Vicini's discussions with Father Hartley.  Another implicit reference to the Vicinis occurs in Father Hartley's statement: "And to think that all the sugar cane (hundreds and hundreds of kilometers) in this area of the country belong to one single family!"  The article makes no explicit statement about the Vicinis' treatment of their Haitian workers; nor does the article state that the *bateyes* and workers described in the article are all found on Vicini property.  Even if the article had done so, the Plaintiffs have provided no reason to believe that the statements in the article are untrue.  *See Mass. Sch. of Law v. Am. Bar Ass'n*, 142 F.3d 26, 42 (1st Cir. 1998) ("Truth is an absolute defense to a defamation action under Massachusetts law. . . . ").[4]

---

[4] *But see Noonan v. Staples, Inc.*, 556 F.3d 20, 26 n.8 (1st Cir. 2009) (holding that under Massachusetts statutory law "truth shall be a justification unless actual malice is proved" with "actual malice" in this context bearing the non-constitutional

The Plaintiffs also state that Father Hartley defamed the Vicinis in 2000 by alleging that the Vicini *bateyes* were better suited for animals than for humans.  The statement, however, is clearly a rhetorical one and cannot be proved true or false, contrary to the required elements of a defamation.  *King v. Globe Newspaper Co.*, 512 N.E.2d 241, 243-44 (Mass. 1987) (finding that statements of opinion cannot serve as a basis for defamation liability).  Also, it was not a statement about the Vicinis in particular; Father Hartley stated in the speech that only half of the *bateyes* were owned by the Vicinis.

It is true that the Plaintiffs should not be required to prove falsity in their defamation claims before the court determines whether or not they are public or private figures. *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1560 n.20 (4th Cir. 1994).  But the Plaintiffs' reference to Father Hartley's 2000 speech and the 2003 *El Mundo* article, with no discussion of how these statements were defamatory, is not sufficient to characterize the Vicinis' actions before 2007 as mere defenses to defamatory accusations.  The Plaintiffs may very well have been motivated by their desire to protect their reputations against Father Hartley's accusations and implications; but defense of reputation is not equivalent to a defense against defamation.  *See Bruno & Stillman*, 633 F.3d at

_____

definition of "ill will").

586 (commenting that *N.Y. Times v. Sullivan* rejected the
proposition that if the plaintiff presented evidence of a
reputation-harming statement, he enjoyed a presumption of injury
and falsity).

Even if Father Hartley's statements in 2003 were somehow
defamatory, the Vicinis' actions thereafter would not be
sufficient to qualify as defensive actions for purposes of the
statements made in *The Price of Sugar*.  In the cases that have
shielded plaintiffs from public figure status due to the
defensive quality of their public actions, the preceding
defamation was the very defamation alleged in the suit, or was
equivalent in content to the alleged defamation.  In *Hutchinson*,
for example, the plaintiff, a researcher, did not become involved
in the controversy until after the defendant's alleged defamation
that the plaintiff had fleeced the federal government.  443 U.S.
at 134-35.  In *Foretich*, the plaintiffs alleged that a television
network had defamed them by broadcasting a docudrama in which a
character accused the plaintiffs of abusing their grandchild.  37
F.3d at 1549-50.  The Fourth Circuit there concluded that,
although the plaintiffs made a series of public statements about
the issue prior to the television broadcast, they did so only
after the accusations - originally made by the plaintiffs' former
daughter-in-law - first surfaced in federal court.  *Id.* at 1561.
The First Circuit in *Bruno & Stillman* found "no suggestion" of
public engagement or activity by the plaintiff, a boat company,

-23-

before the publication of the *Boston Globe* article that was challenged in the suit.  633 F.2d at 591-92.

Father Hartley is not a defendant in this case, and his statements in 2000 and 2003 are not alleged to be defamation in the Plaintiffs' Complaint.  Furthermore, Father Hartley's prior statements, even if defamatory, are not equivalent to the content of the Defendants' alleged defamation; in the latter, the Plaintiffs claim that the falsity of the film's statements lies in the Defendants' alleged assertions that particular images in the film were taken on Vicini property, or that the Vicinis threatened or harmed particular individuals.  The Plaintiffs do not allege that the Vicini *bateyes* lacked the general conditions described both in the film and by Father Hartley in his 2000 and 2003 statements.

Although the Defendants have the burden of establishing the Vicinis' public figure status, the Plaintiffs must provide some support for their claim that their activities before 2007 were mere responses and defenses to a defamation.  I find that they were not mere responses but rather part of an affirmative program to cultivate favorable publicity in the public controversy out of which the alleged defamation arose.

### c.  Was the Alleged Defamation Germane to the Plaintiff's Participation in the Controversy?

The final step in the public figure status inquiry, after identifying the public controversy and the Plaintiffs'

involvement in it, is to determine whether the alleged defamation was germane to their participation in the controversy. *Waldbaum*, 627 F.2d at 1298. If the Plaintiffs attempted to affect the result, they "have assumed the risk that the press, in covering the controversy, will examine the major participants with a critical eye." *Id.* The court must ask "whether a reasonable person would have concluded that this individual would play or was seeking to play a major role in determining the outcome of the controversy and whether the alleged defamation related to that controversy." *Id.*

It is readily apparent that the alleged statements were germane to the Vicinis' involvement in the treatment of Haitian workers on the *bateyes*. The film discussed the Vicinis' interaction with Father Hartley, and the changes and improvements that had already been made on the *bateyes*. I find the alleged statements, describing the conditions on the *bateyes* and the Vicinis' response to those who left the *bateyes* or objected to their conditions, are all germane to the Vicinis' involvement with Father Hartley, the media, and government officials regarding the treatment of sugarcane laborers; in short they are germane to the Plaintiff's participation in the public controversy.

## B.   *Actual Malice*

Because the Plaintiffs are public figures as a matter of law regarding the matters at issue in this case, they must show by

clear and convincing evidence that the alleged defamatory statements were made with "actual malice," i.e., with knowledge of their falsity or with reckless disregard as to their truth or falsity. *N.Y. Times*, 376 U.S. at 279-80; *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (holding that actual malice must be established by clear and convincing evidence).

The First Circuit has observed that the actual malice standard is a "daunting one." *Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002) (internal citations omitted). This is primarily because public figures are obligated to demonstrate that the statements were made "by someone with serious doubts as to the truth of [the] publication." *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996) (internal quotations omitted). The standard is subjective, requiring the plaintiff to show that the defendants "in fact entertained serious doubts as to the truth of [their] publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). But the First Circuit permits plaintiffs to demonstrate actual malice by inference and circumstantial evidence. *Id.*; *Levesque v. Doocy*, 560 F.3d 82, 90 (1st Cir. 2009). Recklessness "may be found where a publisher fabricates an account, makes inherently improbable allegations, relies on a source where there is an obvious reason to doubt its veracity, or deliberately ignores evidence that calls into question his published statements." *Levesque*, 560 F.3d at 90.

A significant portion of the Plaintiffs' opposition memorandum is devoted to attacking the credibility of Father Hartley as a source of information for the documentary.  The Plaintiffs suggest that Father Hartley made "outrageous, exaggerated and false statements" about the *bateyes* conditions, that Jhonny Belizaire and Yela Machasa were his employees and therefore unreliable, that much of the media reporting about Vicini *bateyes* stemmed from faulty information provided by Father Hartley and finally, that the Defendants were aware of these indications of Father Hartley's lack of credibility.  The Plaintiffs' expressed concerns about Father Hartley appear directed to the First Circuit's observation that recklessness can be shown by, among other things, a publisher's reliance "on a source where there is an obvious reason to doubt its veracity." *Levesque*, 560 F.3d at 90.

While the Plaintiffs may be correct that Father Hartley was not a neutral party in the controversy that was documented by the filmmakers, I do not evaluate the Defendants' use of Father Hartley's information in a vacuum.  "[D]efamation plaintiffs cannot show actual malice in the abstract; they must demonstrate actual malice *in conjunction* with a false defamatory statement." *Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987).  Moreover, the fact that Father Hartley was involved personally in the controversy does not make the Defendants reckless for reporting the information they obtained from him.  The Fourth

-27-

Circuit has noted that pointing to a source of information who "might also have provided the information to further the source's self-interest" does not establish actual malice. *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 715 (4th Cir. 1991). "Self-interest (and the related desire to place opposing views and persons in an unfavorable light) motivates many news sources . . . ." *Id.*

To the extent that the filmmakers' reliance on Father Hartley led the Defendants to be reckless in disregarding the potential falsity of a statement, that issue is best taken up in the context of the particular defamatory statements alleged here, a discussion to which I now turn.

### 1.  Alleged Murder and Kidnapping (Statement 1)[5]

In Statement 1, Father Hartley states that "[t]he Vicini family have a lot of blood on their hands. . . . And this is a fact.  People disappear.  People are never found."  The Plaintiffs maintain that the implication of this statement is that "the Vicinis kidnap people and/or commit murder."  Before addressing whether the Defendants had actual malice in making this statement, I must first address the threshold question of what statement is being implied by this segment of the film.

### a.  Capable of Defamatory Meaning

---

[5] The statement numbers used here refer to those numbers used by the Plaintiffs in their response to the Defendants' Interrogatory 14 seeking identification of the alleged defamatory statements.

The parties disagree over whether Father Hartley's comment is capable of the defamatory meaning alleged by the Plaintiffs. The Defendants maintain that Father Hartley was speaking metaphorically, and that the Plaintiffs' proffered implication - that the Vicinis murder or kidnap their workers - is "blatantly unreasonable."

The First Circuit has noted that "[f]orced or strained construction of the statement will not suffice to state a claim for defamation." *Damon v. Moore*, 520 F.3d 98, 105 (1st Cir. 2008). Before permitting the defamation claim to proceed to trial, I must therefore decide the "threshold" issue of whether the communication is capable of the defamatory meaning alleged by the Plaintiffs. *Phelan v. May Dep't Stores, Co.*, 819 N.E.2d 550, 554 (Mass. 2004) (citing RESTATEMENT (SECOND) OF TORTS § 614). When the statement is capable of having both a defamatory and a non-defamatory meaning, a question of fact exists for the factfinder. *Damon*, 520 F.3d at 104 (citing *Jones v. Taibbi*, 512 N.E.2d 260, 264 (Mass. 1987)).

In *Amrak Prods., Inc. v. Morton*, 410 F.3d 69 (1st Cir. 2005), a former bodyguard sued the author and publisher of a book about Madonna for erroneously captioning a picture of an individual with the plaintiff's name. The man in the picture was allegedly an "outspoken homosexual" who engaged in "lewd, lascivious" conduct, and the plaintiff argued that this error would cause a reasonable reader to believe that the plaintiff was

also a homosexual.  *Id.* at 71.   The First Circuit rejected the
defamation argument because nothing in the photograph indicated
that the man pictured was a homosexual.  *Id.* at 73.   For a
reasonable reader to believe that the plaintiff was gay, he would
have had to follow Madonna's cohort closely enough to recognize
the pictured individual as a gay man, but not closely enough to
know the man's real name; moreover, the reader would also "have
to view homosexuals with 'scorn, hatred, ridicule or contempt.'"
*Id.* (quoting *Phelan*, 819 N.E.2d at 553).   Consequently the
photograph was not "reasonably susceptible of a defamatory
meaning."  *Id.*

       In this case, unlike in *Amrak*, Father Hartley's language
could support either interpretation - either that the Vicinis are
morally responsible for the physical suffering of *batey*
residents, or more gravely, that they have caused the murder or
kidnapping of workers.  While the phrase "blood on their hands"
is a rhetorical device, it can nonetheless stand for either idea.
Father Hartley's claim that people "disappear" and are "never
found" is a more concrete allegation, one made more alarming by
the next scene - a neglected cemetery with unmarked graves and
freshly mounded earth.  *See Mabardi v. Boston Herald-Traveler
Corp.*, 198 N.E.2d 304, 306 (Mass. 1964) (finding a potential
claim for defamation when the headline and photograph were
interpreted in the context of the publication).

       Although Haney has stated that a literal interpretation of

-30-

Father Hartley's statement had never occurred to him, his statement misconstrues the relevant issue that governs the process of identifying the alleged defamation. The issue at this threshold stage is not the publisher's intended meaning, but instead the understanding of a reasonable person viewing the film. *See Damon*, 520 F.3d at 103-04 (citing *Amrak*, 410 F.3d at 72). I cannot conclude as a matter of law that the film does not make the implied statement that the Vicinis are responsible for the murder or kidnapping of *batey* workers.

### b. Actual Malice

Assuming for present purposes that at trial the Plaintiffs' interpretation of Statement 1 is determined to be the understanding of a reasonable person, the Plaintiffs have nevertheless failed to show sufficient evidence of actual malice to raise genuine issues of material fact.

The Plaintiffs point to requests for confirmation of the "blood on their hands" statement made by their insurance broker, by PBS, and by Elizabeth Bardsley, the film's fact-checker. They also point to the Defendants' attempts to seek confirmation of the claim from Father Hartley and Vicini workers. None of this evidences, however, knowledge of falsity. Indeed, the Defendants actively attempted to seek stronger confirmation of the claim, and in doing so, demonstrated that they did not know it to be false.

With respect to recklessness, the record shows that the

filmmakers had reason to believe that workers on the Vicini plantation did in fact "disappear."  One worker, Yela Machasa, said in an interview: "Nobody knows about that person anymore. . . . The bosses arrest them and take them with them in their jeep or in their bus and then that person is never seen again." Jhonny Belizaire described cases in which workers disappeared after being imprisoned by Vicini guards.  The *Miami Herald* reported that three workers were beaten and then disappeared after they were caught trying to escape the Vicini complex in November 2003.  According to the Plaintiffs, these additional sources were themselves relying on Father Hartley for information about the alleged disappearances, and therefore likewise lacked credibility as sources.

Even if the Defendants' sources for the statement were not as reliable as they could have been, and this circumstance may evidence some negligence on the filmmakers' part, that is not sufficient for purposes of actual malice.  *See St. Amant*, 390 U.S. at 733 ("Failure to investigate does not in itself establish bad faith.").  In *Levesque*, the plaintiff alleged that a news program had failed to corroborate quotations that its source had fabricated.  560 F.3d at 90.  The First Circuit in response found that "[i]t is true that a more deliberate consideration . . . should have caused reasonable skepticism about the source and that the defendants were careless in relying on it, but this is an indication of negligence, not actual malice . . . ."  *Id.* at

-32-

91.  The D.C. Circuit, when facing a case involving a failure to corroborate, has observed that "actual malice may be inferred from an author's or publisher's inability to corroborate a story only when, in attempting to corroborate, he encounters persuasive evidence that contradicts the allegation."  *McFarlane*, 91 F.3d at 1511.

Without evidence that the Defendants encountered highly persuasive if not conclusive contradictions in their efforts to corroborate Father Hartley's story, what remains is the Defendants' reliance on information from Father Hartley, and reliance on sources that may themselves have relied on Father Hartley (Yela Machasa, Jhonny Belizaire, and various newspapers). As a matter of law, this evidence is not sufficient to establish actual malice in a defamation claim.  I will therefore grant the Defendants' motion for summary judgement as to Statement 1.

### 2.  Belizaire's Fear of Danger (Statement 2)

In Statement 2, Jhonny Belizaire states that if Father Hartley leaves the country: "I am not going to wait for the Vicini to send someone to kill me.  I would kill myself.  Anyone following Father Christopher's path is in great danger." According to the Plaintiffs, the Defendants knew that Belizaire had no genuine fear of being murdered by the Vicinis, and that the statement was false.

### a.  Capable of Defamatory Meaning

The Defendants maintain that any statement made by Belizaire

regarding his fears for his family's safety was not a defamatory statement about Juan and Felipe Vicini. Belizaire himself states in the film that he has never met the Vicinis. This argument by the Defendants is both a challenge to the Plaintiffs' construction of Belizaire's comment, as well as an implicit claim that the statement is not "of and concerning" the Plaintiffs. *Noonan*, 556 F.3d at 25 (listing the elements of a defamation claim to require a statement "of and concerning the plaintiff"). The film, however, both mentions the Vicini family repeatedly, and shows images of Juan and Felipe Vicini as the heads of the company's business operations. I find that a reasonable jury could understand Belizaire's statements to mean that the Vicinis would be directly or indirectly involved in retaliating against Belizaire for his work with Father Hartley.

However, Belizaire's statement is an emotive one of opinion, and consequently it is not actionable under defamation law. If the speaker "is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st Cir. 2000) (citation omitted). Statements of opinion cannot form the basis of a defamation claim. *King*, 512 N.E.2d at 243-44; *see also Levesque*, 560 F.3d at 88 ("A communication is defamatory if it is provable as false . . . .") (internal quotations omitted). Belizaire's statement was plainly

-34-

conjecture about a future event and an expression of fear, the validity of which cannot be proved to be true or false.  As a result, the Plaintiffs cannot proceed on a defamation claim based on Belizaire's fear of future harm.

### b.  Actual Malice

Passing the question whether Belizaire's fear is itself a statement of fact that can be challenged by a defamation claim, I find the Plaintiffs have not adduced evidence suggesting that the filmmakers had actual malice in publishing Belizaire's statement.

Father Hartley told the Defendants at one point that there had been no physical punishment or violence against *batey* residents for several years.  He also told them that the Vicini family had ordered that no harm was to come to those people helping Father Hartley.  But Father Hartley's statements do not falsify or contradict Belizaire's statement that, in Father Hartley's absence, Belizaire feared that he and other Hartley supporters would be harmed.  The Defendants, for their part, suggest that Belizaire had a genuine fear of retaliation, citing Belizaire's statements that he had received death threats from Vicini guards and that Father Hartley had received his own death threats.  While there may be tension between the recent lack of violence on Vicini plantations and Belizaire's described fears, these statements are not contradictory.  The Defendants' failure to reconcile Belizaire's fear with various improvements on the plantations is not sufficient to create questions of fact as to

-35-

the Defendants' recklessness.

In any event, because Belizaire's statement of emotion and fear is not actionable and the Defendants failed to develop evidence that suggests the statement should have been mitigated by improvements on the plantation, I find the statement was not published with reckless disregard of the truth.  I will grant summary judgment as to Statement 2.

### 3.  Belizaire's Alleged Imprisonment (Statement 3)

Statement 3 is a statement by the narrator that "Jhonny has been fired.  He and his family have been threatened with eviction from their home; but without legal status, they are unable to go elsewhere to make a living."  This statement contains three separate factual claims: (1) that Belizaire was fired from cane-cutting work; (2) that he and his family have been threatened with eviction; and (3) that he and his family lack legal immigrant status and therefore cannot leave the *bateyes* to earn a living in the Dominican Republic.  The Plaintiffs claim that the Defendants knew that each of these factual assertions was unfounded.

### a.  Capable of Defamatory Meaning

The parties wrangle over the characterization of the third factual claim in Statement 3.  I agree with the Defendants that a reasonable viewer would understand the end of the sentence to mean that Belizaire's freedom of movement was limited as a result of his immigration status, not as a result of actions taken by the Plaintiffs, although it may be considered a result the

Vicinis were able to exploit.  Ultimately, however, if Belizaire
and his family felt they could not leave the *batey*, it was a
consequence of Dominican immigration practices.  Regarding
Belizaire's inability to leave the *batey*, the Plaintiffs have not
shown how this statement is defamatory as to them, given that the
implication concerns Dominican immigration practices, not the
Vicinis.  This statement is not "of and concerning" the Vicinis,
and cannot support a defamation claim.[6]

### b.  Actual Malice

With respect to Belizaire losing his job, the Plaintiffs
claim that Belizaire was not a regular employee of the Vicinis
and thus could not be fired as such.  But the Plaintiffs do not
identify anything in the record indicating that Belizaire did not
work for the Vicinis.  Indeed, there is evidence in the
Plaintiffs' opposition materials that Belizaire performed cane-
cutting work on Vicini plantations.  Not only have the Plaintiffs

---

[6] Although I find on this ground the statement is not
defamatory as to the Vicinis, I also find there to be no genuine
factual dispute as to whether the Defendants knew, or had reason
to believe, that the statement was false.  At most, the record
shows a dispute regarding the underlying facts.  On the one hand,
some evidence indicates that some members of Belizaire's
immediate family did not have identity papers and that
Belizaire's own claim to citizenship may not have been valid
given that his parents were not from the Dominican Republic.  On
the other hand, the Plaintiffs maintain that the Defendants
allegedly knew that Belizaire and his children were Dominican
citizens with documentation of their legal status.  This dispute,
however, does not sufficiently raise a question whether the
Defendants knew or recklessly disregarded the truth of the
underlying factual issue.

failed to adduce evidence that Belizaire was incapable of being fired, but they likewise have no evidence that the Defendants had actual malice in publishing this statement.  The Defendants for their part adequately identify for purposes of summary judgment the reasons they believed that Belizaire did indeed do cane-cutting work on Vicini plantations.

There is no evidence suggesting that the Defendants knew or had reason to know that Belizaire was not facing eviction from the *batey*.  The Plaintiffs cite only two pieces of evidence to dispute the claim that Belizaire was facing potential eviction: (1) a comment by Grunebaum that as of June 2006, Belizaire was still living on the *batey*; and (2) testimony by Felipe Vicini that "I believe his – his father cut cane and he would cut cane maybe once or twice a – a season so he could still live free of rent in his – in his house."  The Grunebaum statement does not show that Belizaire, by reason of living on the *batey* in June 2006, had not been threatened with eviction; and the Vicini deposition says nothing to suggest that the Defendants knew that Belizaire's living arrangement depended, at a minimum, on his father's work status rather than on his own employment status. The Plaintiffs have not demonstrated genuine issues of material fact as to the Defendants' actual malice regarding Statement 3.

### 4.  Deplorable Working Conditions (Statement 4)

The allegation regarding Statement 4 is that the combination of images and narration suggests that the scene depicts

conditions on Vicini plantations.  After the narrator states that "[w]hat Father Christopher saw in the plantations he began to document," the film provides a series of still images depicting child workers, a child chewing on sugarcane holding a syringe near his mouth, and a pair of hands with a missing finger.

### a.  Capable of Defamatory Meaning

The parties' primary dispute regarding Statement 4 is over the identification of the statement's defamatory nature.  While the Plaintiffs characterize the statement as a claim that these images were taken on Vicini property, the Defendants' position is that any defamatory "sting" lies in the suggestion that the conditions depicted can be found on Vicini workers and *bateyes*.

Defamation claims, of course, can be made on the basis of innuendo.  *Mabardi*, 198 N.E.2d at 306 ("An insinuation may be as actionable as a direct statement.") (internal quotations omitted).  But it is the task of the court to determine whether the explicit statement is susceptible to the inference proffered by the plaintiff.  In *Damon*, the plaintiff argued that Michael Moore, the documentary filmmaker, used the plaintiff's words to convey the statement that the plaintiff opposed the Iraq war and the commander-in-chief.  520 F.3d at 103.  The court ultimately disagreed with Damon's characterization of the message.  *Id.* at 105 ("Stepping back . . . and viewing the documentary as a whole, we are compelled to conclude . . . that a reasonable viewer could not construe Damon's appearance as supportive of Moore's

message."). A different outcome was reached with the same analysis in *Stanton v. Metro Corp.*, 438 F.3d 119 (1st Cir. 2006), which also involved the threshold question of whether the communication, a magazine article, was reasonably susceptible to the defamatory meaning alleged by the plaintiff. The article, about teen promiscuity, depicted the plaintiff in a photograph, but also had a disclaimer that the pictured individuals were unrelated to the story. *Id.* at 122. The parties disputed whether or not a reasonable reader would have concluded that the article was stating that the plaintiff engaged in teen promiscuity. The First Circuit concluded that, notwithstanding the disclaimer, the article was reasonably susceptible of the defamatory meaning alleged by the plaintiff, and reversed the dismissal of the defamation claim. *Id.* at 128, 132.

When considering the scene in *A Price of Sugar* that is at issue here, and taking the documentary as a whole, I find that a reasonable viewer could conclude that the defamatory sting of the Defendants' statement is that the images depict the conditions on Vicini *bateyes*, not that the particular individuals and locations shown on screen are on Vicini property. For example, if the filmmakers had presented images of other individuals who were in fact Vicini workers on Vicini property - but whose conditions were the same as those depicted in the film - then the defamatory inference would be no different: namely, that such conditions can be found on Vicini *bateyes*. *See Veilleux v. Nat'l Broad. Co.*,

206 F.3d 92, 108 (1st Cir. 2000) ("A statement is not false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced.") (internal quotation marks omitted).

###### b.  Actual Malice

The Plaintiffs' actual malice argument for Statement 4 is based on their misconstruction of the film's implication.  Even if the Defendants knew that none of these images depicted Vicini *bateyes*, the Plaintiffs' claim still would not survive summary judgment.

The Vicinis do contend at one point that the Defendants knew that "such conditions" did not exist on Vicini *bateyes*.  But there is nothing in the record to suggest that the Defendants knew that the Vicini *bateyes* did not engage in child labor, did not have malnourished workers, and did not have dangerous working conditions that sometimes left workers with missing fingers.  Nor is there any evidence to indicate that the Defendants had reckless disregard with respect to the truth or falsity of the film's statement regarding these conditions.  The Defendants have outlined their research confirming that the Vicini plantations had poor and dangerous working conditions.  They report that they learned that workplace injuries are common, that workers receive little medical care, and that cane cutters often work barefoot without any protective gear.  They also point to reports of child labor on the Vicinis' plantations.

The Plaintiffs essentially do not challenge the truth of these claims or the research used to support them.  Their only challenge to the depiction of *bateyes* conditions is that some of the images were taken on government-owned *bateyes*, where conditions are known to be worse than on Vicini-owned *bateyes*. This distinction, however, does not contradict the statement that Vicini *bateyes* have the conditions identified in the images.  As a result, the Defendants are entitled to summary judgment as to Statement 4.

### 5.  Conditions in the Barracks (Statement 5)

Near the beginning of the film, Father Hartley states that "I began to learn more about their situation," and "[w]hat I discovered was truly appalling."  His statements are accompanied by filmed scenes from a barrack where living conditions are poor. The Plaintiffs contend that this sequence of the film suggests that the images were filmed on a Vicini *batey*, when in fact they were filmed on a non-Vicini *batey*.  As with Statement 4, however, the defamatory sting in this sequence is that Vicini *bateyes* have the conditions depicted in the film sequence, not that these particular men and women are residents of Vicini *bateyes*.

The Plaintiffs challenge the Defendants' state of mind as to only one of these conditions - the existence of the barracks. The Defendants' January 2006 briefing book noted that "all barracks had been demolished and replaced with concrete housing

-43-

with sanitary facilities,"[7] suggesting that the Defendants knew that the barracks shown in the film no longer existed, yet nevertheless implied that the Vicinis continued to maintain those general living conditions.  However, there is no dispute that the barracks did exist at some point on Vicini *bateyes*.  Therefore, the Defendants did not falsely portray these living conditions, which historically existed on Vicini *bateyes*, and I will grant summary judgment as to Statement 5.

### 6.  Imprisonment in the Barracks (Statement 6)

The sixth defamatory statement consists of Father Hartley showing the cameras into the inside of a barrack, saying that "60 to 100 people are going to be crammed into this one barrack," and that one "can see all this barbed wiring up on the top which is to prevent them from escaping at night and they will have armed men at the doors of the barracks in the night so they don't attempt to flee the barrack in the night."  Images then show a man on horseback holding a shotgun, and men wearing ICC[8] hats and carrying shotguns.  The statement here, according to the Plaintiffs, is that "the Vicinis imprison workers in run-down

---

[7] The Plaintiffs also state that the Defendants had footage of Vicini *bateyes* with concrete houses and running water.  This, however, only suggests that the Defendants knew that at least some Vicini *bateyes* were in better condition than the property depicted in the film.  There is no indication that the Defendants knew that *none* of the Vicini property was in the condition depicted in the film.

[8] ICC is one of the Vicinis' sugar companies.

barracks behind barbed-wire with armed guards to prevent escape."

### a.  Capable of Defamatory Meaning

The parties dispute whether this statement is one about current treatment or past conditions that have since been eliminated.  Later in the film, as the Defendants point out, comments from the documentary participants suggest that such abuse and imprisonment no longer occur.  Yela Machasa states that "[b]efore workers would be beaten," but "no longer."  Belizaire comments that "[p]reviously we were guarded by armed men and that doesn't happen anymore."  Father Hartley observes that "[o]ne of the things that have changed is now people enjoy a freedom of movement[,] and I actively encourage the workers who are unhappy to leave."

Nevertheless, a reasonable viewer could conclude that Statement 6 refers to current conditions in the barracks.  For one thing, the statements at the end of the film suggest that conditions have improved as a result of Father Hartley's efforts, and that conditions improved over the course of the filming process itself - making Statement 6 a description of conditions current at the time the statement was made.  Furthermore, the language itself in Statement 6 suggests ongoing events rather than past conduct: Father Hartley says that "[t]his is where they're going to put the workers when they arrive."  Indeed, one critic reviewing the film described these conditions as ongoing,

noting that the "workers are housed on crude barracks topped with barbed wire and armed guards outside to prevent escape." Although I must consider the film in its totality and other sections of the film may be in tension with this claim, I cannot conclude that a reasonable viewer would not understand Statement 6 to be a description of current living conditions on the *bateyes*.

### b. Actual Malice

The record suggests that the Defendants may have known that these conditions no longer existed. The 2006 briefing book states that the barracks had been demolished, and replaced by concrete facilities with sanitary conditions. The book noted that there were "literally no more barracks in use" and that workers were "allowed free transit" and "nobody attempts to keep them there." In addition, Univision footage from 2004 showed a worker saying that the purpose of the barbed wire was also to prevent thieves from stealing the workers' belongings. But even if the filmmakers knew that the barracks shown in the film did not reflect current conditions on the Vicini *bateyes*, the fact remains that barracks were historically used, and therefore the Defendants did not recklessly portray the past conditions. By the same token, the showing of what the Defendants did not know to be inaccurate depictions of past conditions, does not constitute knowing or reckless falsehood regarding current

conditions.  Summary judgment will be granted as to Statement 6.

### 7.  Malnourishment Allegation (Statement 7)

In the seventh statement, the narrator says that "batey dwellers get much of their calories from chewing sugarcane" and that their diet "often leads to malnutrition."  Although the child in the image is not from a Vicini *batey*, the suggestion is that children on Vicini *bateyes* "suffer just like the child depicted" in the photograph.

The Defendants point to various research indicating that workers in Vicini *bateyes* do indeed suffer from malnutrition, and that they do not get enough food.  The Plaintiffs do not respond with direct evidence that the filmmakers knew that it was false to claim that children suffered like the one depicted, but rather by criticizing the quality of the filmmakers' research - suggesting that the research only discusses malnutrition generally, or that it comes from third parties who repeat Father Hartley's allegations.  This challenge is unfounded.  The Defendants point to evidence of their own experience, their own interviews, and their own documentation on film of the food and nutrition conditions on Vicini *bateyes*.  The Plaintiffs' attack on the Defendants' research techniques may create questions of fact as to the Defendants' negligence in relying on other newspaper reports or in failing to distinguish between different degrees of malnutrition when compiling their data.  However,

there is no genuine issue of material fact as to whether the Defendants knew their statement to be false or were reckless as to its truth or falsity.[9]  *See Levesque*, 560 F.3d at 91.  I find as a matter of law, they did not.  The Defendants' motion as to Statement 7 will be granted.

### IV.   CONCLUSION

For the foregoing reasons, I DENY Plaintiffs' Motion to Strike Portions of Elizabeth C. Koch's Declaration (Doc. No. 166) and I GRANT the Defendants' Motion for Summary Judgment (Doc. No. 154).

/s/ Douglas P. Woodlock
_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

[9] The other contention made by the Plaintiffs is that the Defendants chose not to show images of healthy, well-fed children that can be found in the Defendants' footage.  Defamation law does not oblige filmmakers to show complimentary footage of their subjects, or even to be balanced in their depictions, provided that the statements actually made are true or in this context not made with reckless disregard for whether they are true or not.